IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENEE MORRISON,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>Commissioner of Social Security,<br><br>　　　　　　Defendant. | Case No.: 1:09-cv-01063-JLT<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING THE CLERK TO ENTER JUDGMENT FOR PLAINTIFF RENEE MORRISON AND AGAINST DEFENDANT MICHAEL J. ASTRUE |

## BACKGROUND

Plaintiff Renee Morrison ("Plaintiff") seeks judicial review of an administrative decision denying her claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act").

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed an application for SSI benefits alleging that she suffered from a disability with

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

a claimed onset date of October 1, 1991.[2]  See AR at 13, 125-28.  After her application for benefits was denied by the agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  On November 24, 2008, the ALJ issued a decision denying benefits.  Id. at 10-22.  Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  Id. at 22.  On April 23, 2009, the Appeals Council affirmed and it became the decision of the Commissioner.  Id. at 1-3.

Hearing Testimony

At the administrative hearing held on September 12, 2008, Plaintiff testified that she was a high school graduate.  AR at 26.  She said that she took special education courses through the tenth grade but was in regular classes with supplemental "resource classes" in the eleventh and twelfth grades.  Id.  Plaintiff testified that she didn't get along with other people in high school.  AR at 26.  She stated that she had that problem still.  Id. at 27.

Plaintiff testified that she worked last as a security guard.  AR at 33.  She estimated that she was employed in that job for about one year.  Id.  Plaintiff claimed that she quit working because of back problems.  AR at 34.  She believed that because of her back condition she could not stand for more than five or ten minutes at a time.  Id. at 27.  She estimated that she could sit for only about five or ten minutes at a time as well.  Id.  Plaintiff stated that she took pain medication for her back condition, including Darvocet, Naprosyn and muscle relaxers.  Id.  She stated that she took this medication about three times a week.  Id. at 34.  She said that she sought treatment from a chiropractor for her back condition.  Id.

Plaintiff testified that she suffered from asthma also.  AR at 27.  She stated that this condition "flares" about one to three times per week.  Id.  She said that she used inhalers for treatment.  Id.  She stated that she had a nebulizer which she used if the inhalers didn't work.  Id.  She estimated that she used the nebulizer two to three times per week.  Id. at 28.  On those days, she stated that she used the nebulizer between one and four times during the day.  Id.

Plaintiff testified that she had panic attacks.  AR at 28.  She claimed that these attacks

---

[2]  A previous application for SSI benefits was denied in June 1994.  AR at 43-54.

1  occurred about once every two weeks.  Id.  She described getting "really shaky and nervous," and
2  believed that they were brought on by anxiety.  Id.  She stated that often being in a room with a large
3  number of people precipitated the attacks.  Id. at 29.  She stated that she took Paxil (once daily) to
4  treat this condition.  Id.  Plaintiff testified that she attended counseling to treat the panic attacks as
5  well.  AR at 30.  She stated that she attended counseling sessions on a weekly basis.  Id. at 31.
6  However, she claimed that sometimes she attended sessions twice a week.  Id.

7       Plaintiff testified that she had four children but that only one, the youngest, a four-year-old,
8  lived with her.  AR at 31.  She stated that the other children lived with their father.  Id. at 32.  She
9  said that these children lived with him because she had health problems, including back trouble.  Id.
10 She stated also that her oldest son gave her trouble.  Id.  Plaintiff stated that she had not seen her
11 other children in 10 years.  AR at 33.  She claimed that their father "alienated" them from her and
12 that she lost visitation privileges because she failed to pay child support.  Id.  She claimed that she
13 couldn't pay child support because she was unable to work.  Id.

14       Patricia Hanson, Plaintiff's mother, testified also.  She stated that she saw Plaintiff on a daily
15 basis.  AR at 35.  She described Plaintiff as having mood swings which caused her to go from being
16 "highly agitated" and "dramatic" to "calm."  Id.  She estimated that Plaintiff called her between six
17 and ten times a day to ask her for advice.  Id. at 36.  In particular, she said that Plaintiff called to ask
18 for advice on taking care of her four-year-old child or handling "business things."  Id.  However, she
19 stated that when she gave Plaintiff advice, often Plaintiff became angry and would hang up the phone
20 on her.  Id.

21       Hanson believed that Plaintiff acted like she had the mentality of someone between the ages
22 of 12 and 15.  AR at 37.  She testified that Plaintiff saw only "black and white and no gray."  Id.  She
23 described Plaintiff's attitude as inflexible.  Id.  As an example, she reiterated that Plaintiff would
24 hang up the phone on her if Hanson provided advice that Plaintiff didn't like.  Id.

25       Hanson stated that her husband, Plaintiff's father, owned a business but would not hire her
26 because she wanted to do things her way and wouldn't take direction.  AR at 37.  She stated that
27 Plaintiff argued with her father often.  Id.  In fact, she believed that Plaintiff was "hostile" with
28 everybody.  Id.  She noted that Plaintiff did not have many friends.  Id. at 38.  She stated that this was

because Plaintiff "used" friends and alienated them. Id.

A vocational expert ("VE"), Judith Lagerian, testified also. She categorized Plaintiff's past work as a security guard as light and semi-skilled. AR at 38. In the first hypothetical posed to the VE, the ALJ described someone of Plaintiff's age, educational background and work experience. AR at 39. This person could lift 10 pounds occasionally and five pounds frequently. Id. In addition, this person could stand/walk for up to six hours in an eight-hour day and sit for six hours as well. Id. The person could never kneel, balance or crawl, could occasionally stoop, and could not push or pull above shoulder level. Id. Also, the person would be required to avoid exposure to dust, fumes and pulmonary irritants and would be limited to work involving simple, repetitive tasks with limited contact with the public. Id. The person did not have a driver's license. Id. at 40.

The VE opined that such a person could not perform Plaintiff's past work. AR at 39. However, she believed that such a person could perform other sedentary work. Id. As examples, she cited the jobs of surveillance monitor, assembler, and production worker. Id. at 39-40. She indicated that this person could perform other, unspecified jobs, as well. Id. at 40.

In a second hypothetical, the ALJ described the same person but with a limitation to standing and walking for only two hours in a day. AR at 41. The VE testified that with this restriction, the person could perform no work. Id. In a third hypothetical, the ALJ added an additional restriction that the person was "unable to relate appropriately to supervisors and co-workers." AR at 41. Again, the VE stated that such a person could perform no jobs. Id.

Relevant Medical Evidence

Because Plaintiff's claim of error on appeal relates primarily to the ALJ's consideration of witness testimony relevant to Plaintiff's mental impairments, the Court focuses on medical evidence addressing this impairment.

Treatment notes from the Fresno Mental Health Center reveal that Plaintiff received treatment between August and November 2005. Notes from August 19, 2005, show that Plaintiff indicated a desire "to get my life back on track and . . . not get into bad relationships." AR at 286. Plaintiff reported disturbed sleep and disturbed interpersonal relationships. Id. at 285. Notes

indicate that she had a Global Assessment of Functioning ("GAF") score of 55.[3] Id. at 284.

Evidence indicates also that Plaintiff was in group therapy. See AR at 246, 249, 252, 257, 269, 271, 274. Although the notes indicate that she received benefit from this therapy, see id. at 246, 249, 253, 257, 265, her attendance was spotty and she missed many of the sessions. See id. at 244, 245, 247, 248, 254, 255, 256, 258, 261, 262, 263.

On November 2, 2005, Plaintiff was examined by Wen Liang Chu with the Fresno County Human Services Department of Behavioral Health. Dr. Chu noted Plaintiff's history, in particular marital troubles between Plaintiff and her husband. AR at 241. Plaintiff denied that her problems with her husband involved assault or breaking things. Id. She told Dr. Chu she just "yelled" at him. Id. Plaintiff denied any drug use. Id.

Upon examination, Dr. Chu described Plaintiff as having good attention and concentration with calm and controlled behavior. AR at 242. He characterized her speech as coherent, relevant and goal directed and her affect as normal. Id. As to her mood, she told him that "I get mad often." Id. Dr. Chu diagnosed depression without psychosis flowing from a relationship problem. Id. He noted a GAF score of 70.[4] Id.

On December 12, 2006, Dr. Rustom Damania, a state agency examining consultant, examined Plaintiff. Dr. Damania reviewed Plaintiff's medical records, including x-rays, and performed a thorough physical examination. AR at 357-60. Based on this, he diagnosed Plaintiff with obesity (Plaintiff was 68 inches tall and weighed 248 pounds), asthma, parasthesias in the lower extremities, chronic low back pain and degenerative joint disease in both knees. Id. at 360. Nevertheless, he determined that Plaintiff was capable of lifting and carrying 10 pounds occasionally and five pounds frequently; standing/walking for six hours in an eight-hour day with normal breaks;

---

[3] A person with a GAF score of 55 is described in the Diagnostic and Statistical Manual of Mental Disorders, 4th ed. (2000) ("DSM-IV"), as falling into the category of "moderate" symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). Id. at 34.

[4] A person with a GAF score of 70 is described in the DSM-IV as falling into the category of "some mild" symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. Id. at 34.

5

sitting for six hours, and; found that she was restricted from reaching above the shoulder level. Id. at 361.

Non-examining agency consultant, Dr. N.S. Dhaliwal, completed a physical RFC Assessment form regarding Plaintiff on January 11, 2007. AR at 363-66. Dr. Dhaliwal concurred with Dr. Damania's functional assessment of Plaintiff's physical capabilities and a "light RFC with environmental limitations." Id. at 366.

On December 14, 2006, Dr. Steven Swanson, a clinical psychologist, performed a consultative mental examination of Plaintiff. He described Plaintiff's personal hygiene and grooming as satisfactory. AR at 349. He found her to be fully oriented to time, place and situation. Id. He described her as likeable, friendly and cooperative. Id. However, he believed that she "appeared motivated to exaggerate symptomatology." Id.

Dr. Swanson found her eye contact to be within normal limits. AR at 349. She told him that she had a driver's license but said that it was suspended because she failed to pay child support. Id. at 349, 352. He found her speech to be normal, her facial expression appropriate and characterized her mood as "euthymic" and "euphoric." Id. at 349. She told him that she had "excruciating pain" in her back that day. Id. Dr. Swanson found no evidence of delusional or hallucinogenic thought and no evidence of psychotic process or suicidal or homicidal ideation. AR at 349. He found her short-term memory and ability for abstraction to be adequate and normal. Id.

Dr. Swanson administered several clinical tests including the Wechsler Adult Intelligence Scale - 3rd ("WAIS-III"), General Memory Index and Bender-Gestalt II tests. He interpreted the WAIS-III test as indicative of a verbal IQ of 70, a performance IQ of 85 and a full-scale IQ of 75. AR at 350. He believed this data indicated borderline intellectual functioning and noted that Plaintiff's performance was significantly lower than same-aged peers. Id. at 351.

Dr. Swanson noted a General Memory Index score of 87 and a Delayed Recall Index score of 87 as well, which he found "essentially consistent with the findings from the intelligence test." AR at 351. He believed that these scores indicated no weakness in the area of memory functioning. Id. Dr. Swanson characterized the Bender-Gestalt II test, which monitors visual motor integration skills, as showing Plaintiff's abilities to be "as good as or better than would be expected based upon age

and level of intelligence." AR at 351.

Based on his testing and examination, Dr. Swanson opined that Plaintiff was able to maintain concentration and relate appropriately to others in a job setting. AR at 352. He believed that she could understand, carry out and remember simple instructions and would be able to respond appropriately in the work setting in regards to regular attendance and compliance with safety rules. Id. He found no substantial restriction in her daily activities and no difficulties in maintaining social functioning. Id.

On January 18, 2007, Dr. Barbara Smith, a non-examining agency consultant, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form. She noted the following mental impairments: affective disorders, mental retardation and anxiety related disorders. AR at 367. In particular, she found that Plaintiff had the following "medically determinable impairments: borderline intellectual functioning, depressive disorder (without psychosis); and anxiety disorder. Id. at 370-71. Nevertheless she believed that these impairments caused only "mild" limitations on Plaintiff's functioning in the domains of activities of daily living and in maintaining social functioning, and a "moderate" limitation in the domain of maintaining concentration, persistence and pace. Id. at 375. She found no evidence of episodes of decompensation. Id.

Dr. Smith concluded that Plaintiff retained the ability to perform unskilled, non-detailed simple, repetitive work tasks; had adequate pace and persistence to perform such tasks; could relate in an appropriate socially effective manner with co-workers, supervisors and the general public, and; could adapt appropriately to a variety of work setting situations, requirements, and changes. AR at 377. In June 2007, another non-examining consultant, Dr. Robert McAuley, reviewed Dr. Smith's findings and concurred with her conclusion that Plaintiff retained the ability to perform jobs involving simple, repetitive tasks. AR at 415.

On June 14, 2007, Scott Catone, a physician's assistant at the Vineyard Community Health

Center in Kerman, California, wrote a "to whom it may concern" letter.[5] Catone stated that he had treated Plaintiff for more than three years. AR at 417. After recounting Plaintiff's physical maladies, including low back pain, obesity and discogenic disease, Catone stated that he believed that Plaintiff suffered from personality disorder that made it difficult for her to hold a job. Id. While he noted that "a quality evaluation [of her mental condition] has not yet been possible," he believed that she did not mesh well or communicate effectively with others, was easily aggravated, frustrated, and prone to hostility, and a had a tendency to "throw a fit if angered enough." Id. He believed also that she might be able to work, but only if she had "[a] very understanding boss," who was willing to work with her physical complaints as well as her "mental and emotional baggage." Id. However, given her impairments, he did not believe it likely that she could engage in "any significant or long lasting employment." Id.

ALJ Findings

As a preliminary matter, the ALJ determined that Plaintiff met the insured status through December 31, 2011. AR at 11. Next, the ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation. First, she determined that Plaintiff had not engaged in substantial gainful activity since September 13, 2006. AR at 15. Second, she found that Plaintiff had the following severe impairments: mild scoliosis, early lumbar discogenic disease, a personality disorder, and a depressive disorder not otherwise specified. Id. Third, the ALJ determined that Plaintiff did not have an impairment, or a combination of impairments, that met or exceeded the level required under agency guidelines for presumed disability. Id. at 16.

Fourth, the ALJ determined that Plaintiff had the RFC to lift and carry 10 pounds occasionally and five pounds frequently; stand, walk, and sit six hours in an eight-hour workday with no kneeling, crouching, and crawling, and pushing and pulling above shoulder level; that she should avoid concentrated exposure to pulmonary irritants; and was limited to work involving only simple, repetitive tasks with limited contact with the public. AR at 17. Based on her RFC assessment, the ALJ determined that Plaintiff could not perform her past relevant work. Id. at 20. However, she

---

[5] Other than cite this letter, Plaintiff points to no medical records in the case file evidencing treatment by Mr. Catone.


believed that she could perform other jobs in the national economy. Id. at 21. As a result, the ALJ determined that Plaintiff was not disabled as defined by the Act. Id. at 22.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. When reviewing the findings of fact, the Court must determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The Court must uphold the determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the findings are supported by substantial evidence. See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which include the five-step sequential disability evaluation process described above. 20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[6]  As noted, applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since September 13, 2006; (2) had medically determinable severe impairments (mild scoliosis, early lumbar discogenic disease, a personality disorder, and a depressive disorder not otherwise specified); (3) did not have an impairment which met or equaled one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; and (4) could not perform her past relevant work; but (5) retained the ability to perform other work in the national economy.  AR at 15-21.  As a result, the ALJ determined that Plaintiff was not under a "disability" as defined in the Act.  Id. at 22.

Plaintiff challenges the ALJ's determination at step five of the sequential evaluation where she found that despite Plaintiff's impairments, she retained the ability to perform other jobs in the national economy.  Doc. 14 at 4-8.

**DISCUSSION**

1. The ALJ improperly discounted the lay testimony of Plaintiff's mother

Plaintiff contends that the ALJ failed to properly address third party evidence by way of the testimony of her mother, Patricia Hanson.  She asserts that, although the ALJ reviewed her testimony, she failed to offer any rationale for rejecting it.

Plaintiff contends that Hanson's testimony supported the notion that Plaintiff's mental impairment "is significantly greater than the learning disability to which she testified and the consultative examiner, Dr. Swanson, addressed."  Doc. 17 at 4.  In support, she cites Hanson's testimony that Plaintiff's impairment caused her to operate at the level of a 12 to 15-year old adolescent, caused her to display unpredictable and dramatic mood swings, and made her react with hostility to advice or direction from others.  Id.; see AR at 35-38.  Hanson testified also that Plaintiff's personality prevented her from maintaining friendships, noting that Plaintiff was inflexible and unable to see things other than in black and white terms.  See AR at 37-38.  Hanson stated that Plaintiff's own father would not hire her because of her hostility and because she wanted to do everything her way and was unable to take direction from others.  Id. at 37.

---

[6] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

In <u>Stout v. Commissioner</u>, 454 F.3d 1050, 1053 (9th Cir. 2006), the Court held that,

> In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. See <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." <u>Dodrill</u>, 12 F.3d at 919; <u>see</u> also <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citation omitted)).

Here, the ALJ acknowledged Patricia Hanson's testimony. AR at 12. However, seemingly, she did not consider it when she evaluated Plaintiff's ability to relate appropriately with supervisors and co-workers. See <u>id</u>. at 44. By declining to adopt a restriction in this realm, she effectively rejected this aspect of Hanson's testimony. In <u>Nguyen</u>, 100 F.3d at 1467, the Court stated,

> The ALJ included neither claimant nor his wife's descriptions of his serious coughing problems in the hypothetical to the vocational expert, nor did he expressly state that he would discount their testimony or give any reasons therefore. *By failing to include in the hypothetical the physical manifestations that were described by the witnesses or expressly rejecting the testimony for legitimate reasons, the ALJ erred*. Lay testimony as to a claimant's symptoms is competent evidence which the Secretary must take into account, unless he expressly determines to disregard such testimony, in which case "he must give reasons that are germane to each witness." The government contends, relying on <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984), that it was not error for the ALJ to disregard lay testimony without giving specific reasons for doings so. . . . The reliance on <u>Vincent</u> is misplaced. In that case, lay witnesses were making medical diagnoses, e.g., that the claimant had a serious mental impairment as a result of a stroke. Such medical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence. However, *lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment.*
>
> *Because the ALJ did not set forth reasons as to why he chose to discount the coughing testimony, . . . the ALJ's conclusion that claimant can do his previous work . . . is not supported by substantial evidence.*

(Citations omitted) (emphasis added).

In light of this authority, the ALJ's failure to analyze whether Hanson's testimony was consistent with her RFC finding and her conclusion that Plaintiff retained the ability to work was error. The Court does not find that this error was harmless. When an alternative hypothetical was presented to the VE that included a restriction limiting a person with Plaintiff's profile from being

1  able to "relate appropriately to supervisors and co-workers," the VE concluded that such a person
2  could not perform any job. Id. at 41; see Stout, 454 F.3d at 1056 ("where the ALJ's error lies in a
3  failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court
4  cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when
5  fully crediting the testimony, could have reached a different disability determination").

6  Defendant argues that the ALJ did not reject Hanson's testimony. In support, he notes that
7  the ALJ included in her RFC assessment a restriction to contact with the general public. However,
8  this restriction does not address Hanson's testimony that Plaintiff was hostile to everyone and could
9  not deal with direction or contradiction from supervisors or co-workers and that, for this reason,
10 Plaintiff's own father would not hire her. Moreover, Defendant undermines his assertion that the
11 ALJ accounted for Hanson's testimony by arguing that her testimony was contrary to the findings of
12 an examining consultant, Dr. Swanson, and two non-examining consultants, Drs. Smith and
13 McAuley. (Doc. 18 at 10).

14 Clearly, this is true. However, the problem with Defendant's assertion that Hanson's
15 testimony is in conflict with the opinions of examining and non-examining doctors is that this
16 argument was never presented by the ALJ as a basis for discounting her testimony. In essence,
17 Defendant contends that if the ALJ wanted to, she could have found reasons for discounting
18 Hanson's testimony. However, as noted, the problem is that the ALJ failed to make any findings
19 regarding the credibility of Hanson's testimony. This Court is limited to reviewing the findings of
20 the ALJ and to reviewing the specific facts and reasons that the ALJ asserts. Connett v. Barnhart,
21 340 F.3d 871, 874 (9th Cir. 2003) (holding that the ALJ's statement of what evidence was credible
22 and what evidence suggested the lack of credibility sufficed as specific findings or reasons for
23 rejecting a claimant's testimony, but holding that the mere presence of evidence in the record that
24 would support the ALJ's conclusions, in the absence of the ALJ's discussion thereof, was
25 insufficient). The Court cannot make findings for the ALJ. Id. Post-hoc explanations, even if
26 correct, cannot support affirming the ALJ's decision. Barbato v. Commissioner, 923 F.Supp. 1273,
27 1276 n. 2 (C.D. Cal. 1996) ("The Commissioner's decision must stand or fall on the reasons set forth
28 in the ALJ's decision as adopted by the Appeals council. 'If a decision on its face does not

adequately explain how a conclusion was reached, that alone is grounds for a remand. And that is so even if [the Administration] can offer proper post hoc explanations for such unexplained conclusions.'") In sum, the ALJ failed to address, let alone provide germane reasons for rejecting, testimony from Plaintiff's mother that Plaintiff had great difficulty relating appropriately with co-workers and supervisors in a work setting. This failure warrants remand for the reasons outlined in Nguyen.

### 2. The ALJ properly discounted the opinion of Plaintiff's physician's assistant

Plaintiff contends that the ALJ improperly discounted the opinion of her "treating" physician's assistant, Scott Catone. (Doc. 17 at 6-7). As noted, in June 2007, Catone wrote a "to whom it may concern letter," stating that he had "treated" Plaintiff for more than three years. AR at 417. He noted Plaintiff's physical impairments but did not find categorically that they prevented her from working. Id. However, he believed that she suffered also from "a personality disorder which makes even holding a job suspect." Id. He stated that she "is easily aggravated, frustrated and becomes quite hostile." Id. He believed it is "highly doubtful that she'd serve as an asset to any company, if hired to deal with customers or if [forced] to cooperate with co-workers." Id.

As a physician's assistant, Catone does not qualify as an "acceptable medical source" under agency regulations.[7] Nevertheless, the opinions of "other" medical professionals, such as physician's assistants, may be considered in assessing the severity of a claimant's impairment. 20 C.F.R. § 416.913(d)(1). Social Security Ruling ("SSR") 06-3p states that "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-3p at 4. The ruling notes further that, while generally, the opinion of an "acceptable medical source," such as a physician, is entitled to greater weight than the opinion of a medical source who does not fall into this category, in some instances "an opinion of a medical source who is not an 'acceptable medical source,' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." Id. For example, where the "non-acceptable

---

[7] 20 C.F.R. section 416.913(a) defines the following as "acceptable medical sources": (1) licensed physicians (medical or osteopathic doctors); (2) licensed or certified psychologists; (3) licensed optometrists (for establishing visual disorders only); (4) licensed podiatrists (for establishing impairments of the foot and ankle only); and (5) qualified speech pathologists (for establishing speech or language impairments only).

13

medical source" has seen the individual more often that an acceptable medical source "and has provided better supporting evidence and a better explanation for his or her opinion." Id.

In Bergfeld v. Barnhart, 361 F.Supp.2d 1102 (D.Ariz. 2005), the court held that a nurse practitioner's opinion should have been considered even though she was not a physician.[8] 361 F.Supp.2d at 1112. The court stated that "ALJs are 'not free to disregard the opinions of mental health providers simply because they are not doctors" or because they opined on the "ultimate issue" of whether the impairments were disabling. Id. Because the nurse practitioner was a "treating medical source," the Court held that "the law requires the ALJ to provide 'specific and legitimate' reasons for rejecting her opinion in favor of [a physician's]." Id. at 1113.

In this case, the ALJ rejected Catone's opinion because she believed it was based upon Plaintiff's subjective complaints and because it was not supported by objective medical findings. See AR at 20. In addition, it is clear that the ALJ believed that the opinion of an examining doctor, Dr. Swanson, who performed a mental status examination of Plaintiff and concluded that Plaintiff was "able to maintain concentration [and] relate appropriately to others in a job setting," was entitled to greater weight than Catone's opinion. See id.

Upon review, the Court concludes that the ALJ provided specific and legitimate reasons for discounting Catone's opinion. The only document in the record relating to Catone is the "to whom it may concern letter" of June 14, 2007. AR at 417. As noted by the ALJ, Catone does not cite any clinical or diagnostic evidence in support of his opinion in that letter.[9] In fact, he states in the letter, without explaining why, that "a quality evaluation of Plaintiff's [mental impairments] has not yet been possible." Id. By itself, the failure to provide clinical or diagnostic support for an opinion constitutes a specific and legitimate reason for discounting even a treating doctor's opinion. See Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004); see also Magallanes v. Bowen, 881 F.2d 747, 751 (holding that a lack of supporting clinical findings is a valid reason for rejecting a

---

[8] Nurse practitioners, like physicians' assistants, fall into the category of medical sources not considered "acceptable medical sources" under the regulations. 20 C.F.R. s 416.913(d)(1).

[9] In fact, nothing in the record beyond Catone's statement establishes that he "treated" Plaintiff for "more than three years."

treating physician's opinion).  Likewise, it is a sufficient basis for discounting Catone's opinion.

        3. <u>Remand for further proceedings is appropriate</u>

        The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate repayment of benefits is within the discretion of the district court.  <u>Harman v. Apfel</u>, 211 F.3 1172, 1178 (9th Cir. 2000).  When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation.  <u>Moisa v. Barnhart</u>, 367 F.3d 882, 886 (9th Cir. 2004) (citing <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed.  <u>Varney v. Secretary of Health and Human Services</u>, 859 F.2d 1396, 1399 (9th Cir. 1988).

        Because the Court concludes that the ALJ failed to provide germane reasons specific to Plaintiff's mother for rejecting her testimony that Plaintiff had severe problems relating to social functioning and dealing with others in the work setting, and because it is not clear that Plaintiff will be entitled to an award of benefits after consideration of this issue, remand for further proceedings is appropriate.  <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply award benefits is within the discretion of the court).

## CONCLUSION

Based on the foregoing, this matter is HEREBY REMANDED for further proceedings consistent with this decision.  The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated:  **September 8, 2010**                            **/s/ Jennifer L. Thurston**
                                                                                 UNITED STATES MAGISTRATE JUDGE